Good morning, Your Honor. My name is David Sher, and I represent the appellant, or later Darilyn Johnson, on behalf of the United States. Your Honor, the District Court erred in this case when it granted summary judgment sua sponte after failing to carry its burden of proof and drawing inferences against the appellant, the non-moving party in this case. Your Honor, there are several issues here, so I'm going to take them in the order of scienter, materiality, and then the employment claim. First of all, Your Honor, the Court erred in its application of the standard of scienter. Scienter under the False Claims Act is kind of like reckless driving. You can't just say, oops, I didn't know that the speed limit was 85. You are held to know what the speed limit is. That's deliberate ignorance of the law, one of the ways you get to scienter under the False Claims Act. Secondly, you can't just say, oops, I wasn't watching my speedometer. That would be reckless. And that's what this Court held in U.S. v. Bollinger. The FCA is satisfied if the plaintiff alleges the defendant either knew the figure was false or acted with reckless disregard of its truth or falsity. Here, the defendant testified that it was trained and was competent in Medicare laws. Jamie Baker, the person in charge of the Medicare billing, testified to that fact. Judith Cutler, the corporate designee, testified that she delegated that responsibility to Jamie Baker. The defendant also testified that it knowingly placed the referring provider as the rendering provider over 3,000 times on claims. There's no question that the claims in this case were false. That issue is undisputed. Both experts, defendant's experts, expert and plaintiff's expert, testified that the law is clear in this case, it is easy to understand, and providers are held to know it. The defendant can't simply say, as it seems to be saying here, oops, I thought the rendering and referring provider were the same thing. That's deliberate ignorance of the law. The defendants can't also say, oops, well, there was somebody on site, and I'll get to who is on site when I discuss materiality. But they can't just say there was somebody on site, we just don't know who it was because we didn't do it correctly. That would be reckless. Medicare cares who is the rendering provider. That's why the I contend there's lots of evidence in the record on the issue of Cyanter, at least that would require a trial. Plaintiff's expert testified in answer to the question, do you believe that Caner Medical Group should have known to put the correct rendering provider on Box 24J? Our expert testified, everybody has to know, should know. I mean, it's again, like you know, we all need to know our traffic laws. And you know, we get older, we forget our new laws are passed, and we didn't read the newspaper, we're not allowed to talk on our cell phones in the car, never bothered to read it, so you don't know. But you know that doesn't mean a cop can't pull us over for talking on our cell phone because that's the law. And these are the laws and the rules, and everyone is expected to know it. She's talking about Medicare. Everyone is expected to follow it. Medicare has the best transparency of all payers in terms of the rules. They're very clear. I want A, B, C, and D, and they get clear in the MedLearn area, which is the online website. And there's other evidence that defendant knew what the rules were and simply failed or refused to follow them. Defendant argues that its conduct in this case was negligent. And I contend, Your Honor, that first of all, there's no evidence of that, and second of all, that is at least a question of fact for the jury, and that's where the Court erred. Earlier today, the first case we had was Medicare fraud, where people were putting in false claims, where they were not entitled to reimbursement. There was no actual illness of any type that required this illness. Is there anything in this case that shows that these individuals were not entitled or that the company was not entitled to get paid, that somehow or other there was some fraud going on? Well, yes, Your Honor, there is, and that really is the issue of materiality. That's why I'm getting to materiality. I mean, is this a matter of just checking off the wrong form, but essentially these people were doing the service and these people were entitled to the care that they were getting, or were there actual fraud going on or just a technical glitch in the form? The answer to that is yes and no. Sorry. If I may, sir. Do you have so many questions? There is no question that we don't argue that the services were not correctly rendered. In other words, there was a provider who actually performed the service. There's no argument that the service wasn't necessary. But there's really two instances of fraud here. First of all, and this gets into really is a question of materiality, not scienter, but I want to address the question of fraud. Fraud, intent to defraud is not required. That statute doesn't require it. It's not in the original statute. It's not in the amendments to the statute. The FIRA amendments to the statute removed the words intent to defraud or knowledge as to the government from sections A1A and A1B of the statute. So that intent to defraud is simply not required. What's required is that the defendant acted recklessly or negligently. As to your question, Your Honor, there are two ways in which the defendant committed, we say false claims here, or in the vernacular using fraud. First of all, the defendant on numerous occasions billed a physician's assistant or an NP as a doctor. And that's important because in that case the United States paid 15 percent more than it should have. So in that case and in all of those cases and all of the defendant's witnesses testified that at least in some instances there was a physician's assistant or a nurse practitioner on site that actually that was listed wrongly as the rendering provider. A doctor was listed instead of the PA or the NP. And in that case it is fraud because the government paid more than it should have. Second of all, and we contend, Your Honor, that listing the wrong rendering provider is fraud because if there is a problem, if there's an act of medical negligence or some issue with the way the service is treated, Medicare has no way of knowing who actually rendered the service. And we contend that's material. Both defendant's expert and plaintiff's expert testified that both issues would be material, that they are important, and that the government cares about that. And the standard on materiality, Your Honor, is low. First of all, Your Honor, I had the pleasure of reading the statute again on the plane. And if you read it closely, you will see that Section A1A does not actually require materiality. So this case it hinges on false claims, not false certifications, which is A1B. A1B specifically uses the word that the claims that the false certifications must be material and defines materiality. A1B does not have that requirement. It is nowhere in the statute, and we contend that Congress did that intentionally. All that is required is the submission of a false or fraudulent claim, not an fraudulent claim, without any requirement of materiality. But if there is a requirement of materiality, that standard is low. It is simply capable of influencing. As this Court held in the Longey case, in the Longey case there was no actual damage to the government. The government got the standards that the government required. All that happened is that the product was falsely induced in the first place. And the Court held all that is required under the test for materiality, therefore, is that the false or fraudulent statements have the potential to influence the government's decision. And we argue that is the case here for two reasons. First, there was money at issue, and it is U.S. taxpayer money. And there is substantial evidence in the record, and I know the defendant contends there was always a doctor, a physician on site, but that is not the case. Dr. Koehner, who is the doctor whose practice this is, Mr. Gambini, who rendered the service, and Jamie Baker, again, who was the Medicare biller, all testified that at least on some occasions the person who rendered the service was a PA or NP. And I'm citing in the record at 293, I asked Jamie Baker, sometimes the referring provider is an RN, right? She said an RN, question mark. Question, a nurse practitioner, answer, a nurse practitioner, yes. Okay. Now, sometimes am I correct that sometimes a supervising provider on site in Bedford is a PA, physician's assistant, or a nurse practitioner. Her answer is that's correct. So at a minimum, there are issues of fact as to whether or not and to what extent a physician's assistant or a nurse practitioner rendered the service, in which case the government would have paid 15 percent less, even assuming that the services were performed correctly. Secondly, as I just mentioned, the CMS does care who the provider is that rendered the service. Both experts testified to that. And the direct question is, this is a question to our expert, so it's your opinion that even if the group practice ultimately bills on the claims and receives all the money for the claims, Medicare really cares that there was a discrepancy in the identification of the ordering physician as the supervising physician, answer, yes. The point is there was a question of fact on that issue that the judge literally viewed the facts against the appellant, not in its favor. Your Honor, lastly, I'll briefly attempt to address the employment claims. There are really two issues in the employment claims. First, the Court last memorandum on June 18, 2012, is now protected conduct. The standard of protected conduct is simply notice. This Court, sorry, the Southern District of Texas held in U.S. Exera George v. Boston Scientific, the following, an employer does not need to know that the employee has filed or is even contemplating a key TEM action, nor does the employee need to use magic words like illegal or unlawful to put the employer on notice of the employer's protected activity. That's the question. The question is, did the defendant have noticed that the plaintiff was protesting illegality in a government program? And there's simply no question about that. In this case, the defendant stated in her memo one week before she was fired, I'm sure we know it's all against the law to bill Medicaid patients. She actually did use the magic words, even though she was not required to. She's clearly putting her employer on notice. What you're doing here is illegal and unlawful in a government program. In addition— They're putting them on notice that it was unlawful to bill Medicaid patients. This is on the co-pay issue? Yes, Your Honor. Were they ever explicitly put on notice about the issue of the getting 15 percent more? Because you had to put in this NPI, National Provider Identification Number. Yes. Is there evidence that where she says, you know you're doing this, so you can get 15 percent more than you're actually entitled to get for who does the work? No, Your Honor. No evidence that she told them that? No, Your Honor. She never did tell them that. What she told them was that she had concerns that the services were not being rendered correctly. That's her testimony. And the defendants have thrown in what we think is a red herring, that we properly amended the complaint as the evidence developed in the case. That's the right thing to do. The appellant protested all along that things were not being done correctly, that the services were not being rendered correctly, and that there was no legal standard that applied to that, and she did not put that in writing. What she did put in writing was this issue of co-pays. And the defendant, in fact, acknowledges that. Judith Cutler, who is the CEO and was the corporate representative, when asked, what did you understand Ms. Johnson to mean when she sent you this e-mail? And her answer is exactly what it said. And I said, which is what? And she said that we were, that she was interpreting that we were doing something that was not quite right. She didn't say that we were doing something illegal, but that's about as close as you can get to an employer acknowledging that she knew that the, that her employee, who she fired one week later, was protesting that something was wrong, something was illegal. At a minimum, there are issues of fact on whether this rises to the level of protective conduct for purposes of a, of a summary judgment motion. I'm sorry, Your Honor, on the issue of causation. Neither, the defendant moved for summary judgment, that motion was stricken. The plaintiff moved for summary judgment, that motion was denied. But neither party moved on the issue of causation. The defendant moves, I'm sorry, the Court moved sua sponte on the issue of causation and said that because of the counseling memos, that must have been the reason for the plaintiff's termination. But there is substantial evidence in the record to contradict that. The defendant, the appellate disputes if that counseling ever occurred. She disputes that she ever receives counseling. This is all throughout her deposition. I'm happy to cite it. She even disputes the dates of the counseling themselves. Two of the counseling notices are dated by the appellant, sorry, are dated by the defendant on a Sunday. And the, the appellant's testimony is that she wasn't there on that Sunday, so she could not have signed them. She didn't know they existed. She only, she only even became aware of them on the date of her termination. This is an issue of pretext. We argue that these memos are pretext. The defendant argues they're causation. That's a question of fact. That's exactly the kind of thing that, that is a question of fact for the jury. This theory about the, the overpayment of 15 percent, what, was it raised in, in your complaint? It was not raised in the original complaint. It was raised in the amended complaint. Okay. And since you have a few seconds, on the co-pay, was there an admission by the Canada Medical Group that they actually would collect the co-pay and keep it unless a patient legitimately complained that you've been paid twice, once by Medicaid, Medicare, and, and now by me, and I need to get my money back? Yes. Did they admit that? Yes, Your Honor. They, the evidence in the record is from Ms. Baker, that she was aware that there were co-pays sitting on the record, on the, on the bill, the books for as many, as much as four or five years. I don't know that she said, we'll wait until we get called, but that was their actual practice, was for them to wait until they got called, and that is exactly what Ms. Johnson was saying was illegal. Thank you, Your Honor. Thank you. Mr. Nelson. May it please the Court. Courts have consistently said the False Claims Act is not intended to be a general enforcement mechanism for federal law, but that is the effect of Ms. With regard to the substantive False Claims Act claim, the federal courts agree that there is no False Claims Act liability for negligence. At a minimum, the court, the FCA requires recklessness, and this Court has said that the FCA requires acting with guilty knowledge of a purpose to cheat the government. Here we have a mere clerical error. Nothing suggests that Caner knew that it was putting the wrong information into two boxes on the claims form, or even suggested, or even suspected that there was something wrong. Second, with regard to the retaliation claim, the FCA does not provide protection for individuals who make general claims of unlawful conduct. Instead, the necessary prerequisite for an retaliation claim is an accusation that the employer is bilking the government. And here, Ms. Johnson said, you're improperly billing patients, not you're improperly billing the government. There's no False Claims Act liability for anything with regard to other individuals. Is this on the copay? This is on the copay. That's on the copay. Well, but if a bill is $200, and I'm just using that number, but if a bill is $200 and Caner collects $100 of it from the patient and then bills the government for $200, isn't the government being overbilled? Two responses, Your Honor. Not necessarily. If the situation is it's unclear as to whether or not the individual has Medicare or Medicaid coverage at the time, because especially the Medicaid coverage changes with some frequency, such that if you would bill the client for it, or bill the patient for it, hold on to the money, and then after receiving the reimbursement from the government, refund the money, then no. But second, that's not what she was complaining of here. She specifically was complaining about billing Medicare or Medicaid patients for services that aren't covered by the federal programs. In other words, they were services that weren't Medicare or Medicaid covered services. The patient wanted them, the patient received them, and the patient was responsible for paying for them, not Medicare or Medicaid. That's specifically what she says in the sentence immediately preceding the sentence that talks about we all know that this is against the law. Going back, I'd like to, if I may, return first to the issue of the Substantive False Claims Act claim. And Brother Counsel has indicated that this is like the speed laws or stop signs. And he's absolutely wrong. And this is why he's wrong. The speed laws of the various states and traffic signs are strict liability laws. The state doesn't care what your intention was. If you violate the speed limit, you're liable. That's not the False Claims Act. Congress specifically said you must demonstrate that a party knowingly submitted false claims. That's what distinguishes this from the speed limits. Here, they're trying to impose strict liability, which is exactly what the False Claims Act doesn't do. They're saying that in sub-regulatory guidance, on a single page, a single sentence on that page, out of the 37,000 documents maintained by CMS, says you put the supervising physician's name in the rendering provider box on the form. And my client should have been aware of that, i.e., was negligent if he wasn't aware of that. And consequently, there ought to be False Claims Act liability. That's not what the False Claims Act imposes treble damages for. The False Claims Act imposes treble damages for knowingly submitting false claims to the government, for knowingly trying to get money that it was not entitled to. And there's no evidence of that here. But you're not disputing that they could get 15 percent more if it looked like a doctor provided the service? Before I get to that, I do dispute that. But I want to make clear, even if my client did, even if there was an issue of materiality, without scienter, summary judgment was proper in this case, and the district court's judgment should be affirmed. But turning to the question of materiality, the issue, two things. First of all, there was a suggestion made by my friend that there are many cases in the record that show that we violated the 85-15 rule. I would challenge my friend to identify a single claim that was submitted to the government that violated the 85-15 rule. He didn't do it in the district court. And without any evidence of an actual false claim submitted to the government, I don't know how we could go to trial. This is the False Claims Act. You have to submit a false claim. And to date, Ms. Johnson has never been able to identify a material false claim. What she has been able to identify is claims that have the wrong provider listed in the Inbox 24-J. That's on its own not material, but it's not a material claim. If proper supervision was rendered. And there's no question here that there was proper supervision. The only testimony to suggest that there was, that the government would consider this to be material was a statement by Ms. Johnson's expert, who never worked for the government, who doesn't now work for the government. The statement of an expert on its own that a fact is so, does not make it so, and does not create a genuine issue of material fact for summary judgment. For good reason. Otherwise, summary judgment would be well-nigh impossible to get in any sort of complicated case. But look what evidence isn't here. There's no evidence of past history by the government and how they treated these claims. There's no evidence of enforcement actions by CMS. There's no evidence from anyone representing the government in this case as to what they would do. All we have is Ms. Cabuzzi's testimony, and that's simply not sufficient. There was also a suggestion today that the False Claims Act doesn't require materiality with regard to a claim under the first prong of the False Claims Act. Opposing counsel is correct. Materiality is listed in the second one, but not the first provision. However, every court in this country has uniformly adopted a rule that says for the definition of false claim includes materiality. And for this court, I would point the court to the Spicer v. Westbrook case that's cited in our brief that sets forth the elements of a False Claims Act claim and includes materiality. The courts are uniform. Materiality is required for this. The With regard to the testimony as to who was present, there's no evidence in the record. We submit that the record is clear, that the evidence is that 100% of the time there was a physician on site so that any mistake was immaterial. But even if you were to say, well, that seems to be, as my friend suggests, that seems to be less than clear. What is clear is there's no testimony that says there was ever a situation where the supervising provider was anything other than a doctor. And without that evidence, the plaintiff having the burden of proof, they cannot prevail on the materiality claim either. With the court's permission, I'd now like to turn to the retaliation issue. And with regard to the retaliation issue, again, the protected activity under the False Claims Act is not any complaint with regard to any sort of unlawful activity. It's claims that specifically, the protected activity is specifically activity that opposes bilking the federal government. Not some sort of violation of federal law, not an error in billing with regard to a federal program, but specifically it has to be related to submitting a false claim to the federal government because that's what the False Claims Act prohibits. Ms. Johnson's e-mail fails on two prongs with regard to this. She has to demonstrate both that an objective employee, looking at what she did, would say that she was opposing activities prohibited by the False Claims Act, and that an objective employer, having notice of what she was doing, would realize that she was opposing conduct under the False Claims Act. And if you look at her e-mail, it does neither because it's limited to the fact that this issue of potentially over-billing dual-enrolled Medicaid-Medicare patients. As a factual matter, that's not true. It wasn't an accurate complaint. That's one of the reasons you don't see it in the case now. But as a legal matter, it's not sufficient to be protected activity under the statute. My friend suggested that there was evidence that she put us on notice that we were not billing the government correctly. That's not true. The evidence, the only thing that they cite to that would put us on notice, put my client on notice, as to what was the unlawful activity, was that e-mail from the middle of June 2012, and it specifically deals with billing patients, not the government. Unless the Court has further questions, I would ask that the Court affirm the District Attorney's report. Thank you. Thank you, Your Honor, so I'll be very brief. First of all, I just want to talk about the record. On pages 14 to 16 of the appellant's brief, the appellant gives a specific example of fraud, an example in which Dr. Livingstone was listed as the rendering provider when he clearly was not, by evidence in the record. In addition, the appellant goes on to give to State that in 2012, Dr. Livingstone was not there. That's the testimony. During that entire time period, the defendants listed him as the rendering provider. He was not only not in another office, he was out on medical leave. So he could not possibly have been the rendering provider. So there are numerous examples. In addition, the parties were preparing for trial, and the appellant prepared a spreadsheet which identified all of the false claims and provided them to the defendant. The defendant refused to accept that, but it was certainly there. And if we were to go to trial in this case, we actually have all 3,300 and some odd claims, all of which are false. We also have the schedules of all of the providers. And what we will do to prove this at trial is we will match up those claims with the schedules and identify each and every instance where the rendering provider was not the referring provider, and each and every instance where that rendering provider was a PA or an NP and not a doctor, as was listed on the claim. And that's how we would come up with the actual calculation of damages in this case. So there's plenty of evidence in the record that would merit a trial in this case. Very briefly on the issues of Scienter, I know the defendant vigorously argues for negligence and we vigorously argue for recklessness. And I simply contend that, first of all, that the defendants acted with reckless indifference or acted knowingly. They actually knew what they were doing. They knew what they were putting in the box that says rendering provider. They testified. We put the referring provider there. At a minimum, they deliberately ignored what the law says. And finally, these are clearly issues of fact that, if viewed in the light most favorably for the defendant, would merit a trial. As to the guilty knowledge standard, we contend, Your Honor, that one case in 2008 is simply wrong. And there's an opportunity for this Court to correct it. The Bollinger case in 2014 already did. The FIRA amendments already did. Every single court in this country has held that intent to defraud is not the standard, that the standard is exactly what the statute says, deliberate indifference or reckless indifference for the truth. And lastly, Your Honor, just to clarify on the issue of protected conduct, Ms. Johnson's e-mail, and it's pretty clear and it was actually discussed, there's testimony that the parties discussed, the defendant discussed this e-mail with the defendant, I'm sorry, with the appellant. I'm sure that we all know it's against the law to bill Medicaid patients and goes on. The problem with these accounts is that they are back from 2007, 2009, as I explained to you, Medicare and Medicaid patient refund. This is a claim or a protestation of what she thought was fraud or unlawful conduct for two reasons. First, as Your Honor pointed out, this could result in an overpayment. In other words, the government paid more money than it should have because of the collection of the copayment. Second of all, this is an issue of defrauding patients. Medicare cares not only that it pays the correct amount but that its patients do as well, that the people who are using the Medicare system are not also defrauded. So what Ms. Johnson is saying here is two potential things are happening. One, Medicare is paying too much. Two, our customers are paying too much, and our customers are customers of Medicare, and that's important too. For all these reasons, I ask the Court to reverse and remand to the District Court. Thank you. Thank you, gentlemen.